UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANCISCO CRUZ RODRIGUEZ,<br><br>    Petitioner,<br><br>    v.<br><br>SAMUEL OLSON, in his official capacity as Field Office Director of U.S. Immigration and Customs Enforcement, *et al.*,<br><br>    Respondents. | Case No. 1:25-cv-12961<br><br>Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

The petition [1][1] for a writ of habeas corpus is denied.

### FACTS

"Petitioner is a 38-year-old citizen of Mexico" who "is married to a U.S. citizen and has three U.S. citizen minor children." [1] at 15. Petitioner alleges he "has no prior criminal history"—that is, he "has never been convicted of any crime." *Id.* He also alleges that he "poses no security threat to the United States." But while petitioner has never been convicted of a crime, he concedes that he "entered the United States nearly twenty years ago" and "has no prior immigration record." *Id.* Petitioner does not argue that he is ineligible to be deported. *See generally* [1].

Immigration and Customs Enforcement ("ICE") "agents detained Petitioner on October 22, 2025." *Id.* at 15. Petitioner alleges that he was "working in landscaping in Oak Park" and that "ICE detained him without a warrant." *Id.*

The United States does not contest the veracity of petitioner's factual allegations. *See* [7] at 1–2.

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

# ANALYSIS

Petitioner has brought a petition for habeas corpus under 28 U.S.C. § 2241. He alleges that he "is in custody in violation of the Constitution or laws" "of the United States," *see* § 2241(c)(3)—specifically, that his detention by the executive branch violates federal statutes and the United States Constitution.[2]

Petitioner argues that he was illegally apprehended by ICE, *i.e.*, without a warrant or exception to the warrant requirement; that he is being detained in violation of the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. § 1226, under which federal regulations would entitle petitioner to a bond hearing before an immigration judge pending removal proceedings; and that his detention, if mandatorily imposed, violates the Due Process Clause of the United States Constitution, *see* U.S. const. amend. V. The United States contends that petitioner's detention without a bond hearing is permissible under 8 U.S.C. § 1225(b)(2), which provides for mandatory detention during removal proceedings, and does not violate the Due Process Clause. The United States also contends that all these issues are precluded from judicial review under various jurisdiction-stripping provisions of the INA.

The court begins by addressing jurisdiction, as it must. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)). The court then briefly explains that under Seventh Circuit precedent, because petitioner's deportation proceedings have begun, challenges to his arrest are not grounds for relief on habeas. Next the court explains why petitioner is properly detained under § 1225(b)(2)—which requires mandatory detention pending removal proceedings—and is not entitled to a bond hearing under § 1226. Finally, the court addresses whether § 1225(b)(2) violates the Due Process Clause, finding that it does not.

Because petitioner's custody does not offend any federal rights, the petition under § 2241 is denied.

---

[2] Most custody by federal officials is challenged via 28 U.S.C. § 2255. That section, however, applies to "prisoner[s] in custody under sentence of a court." § 2255(a). Because petitioner is not challenging a conviction by a court, his petition is properly before this court under § 2241. *See* 28 U.S.C. § 2244(a). The court also notes that venue is proper in the Northern District of Illinois. A habeas petition must be filed "in the district of confinement." *See Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004) (quotation omitted). This requirement is one of venue. *See Trump v. J. G. G.*, 604 U.S. 670, 672 (2025); *see also J.O.P. v. United States Dep't of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *17 n.4 (4th Cir. May 19, 2025) (Richardson, J., dissenting) (explaining that this requirement is one of venue, not jurisdiction). Because petitioner filed this petition while "detained at the Broadview Detention Center," *see* [1] at 13, venue is proper in this court.

## I.   The Court Has Jurisdiction

The INA has several jurisdiction-stripping provisions that bar review of claims by those in the custody of immigration officials. Specifically, the United States contends that three provisions preclude review of this habeas petition. First is § 1252(g); second is § 1252(b)(9); third is § 1252(a)(2)(B)(ii). [7] at 14–20.

### A.   Section 1252(g)

Section 1252(g) reads: "including" petitions brought under "section 2241," "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." The court does not write on a clean slate. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999), requires that because petitioner is challenging the detention that attends his proceedings, and not any of the discrete actions listed in § 1252(g), the jurisdictional strip does not apply.

The Supreme Court explained in *Reno* that many issues which arise *after* a decision to commence proceedings are not barred from review by § 1252(g). Section 1252(g) does *not* say "no judicial review in deportation cases unless" the INA explicitly "provides" for "judicial review." *Reno*, 525 U.S. at 482 (cleaned up). Rather, what it "says is much narrower. The provision applies only to three discrete actions that the Attorney General may take: "her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* (citing § 1252(g) (emphasis in original)).

In this case, petitioner's claims related to the INA are either that a mandatory detention statute does not apply to him, or in the alternative that it is unconstitutional. The questions of what a statute means and whether it is constitutional are wholly unrelated to actions taken by the Attorney General. And inasmuch as petitioner challenges his detention, the United States claims his detention was imposed mandatorily, so there was no *decision* to detain at all. Petioner's claim that a warrantless arrest entitles him to relief also is not covered by this strip. While it is related to "the decision . . . to commence proceedings," it is merely a challenge to how those proceedings were commenced, not the decision to do so in the first place. Thus, this case is not covered by the jurisdiction strip, as interpreted by *Reno*.

The United States responds that because petitioner's "detention arises from the decision to commence such proceedings against him, as well as the immigration judge's potential adjudication that bond is either unavailable or inappropriate for him," his detention falls under § 1252(g)'s scope. But the Supreme Court has explicitly "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings.'" *Dep't of Homeland Sec. v. Regents of*

*the Univ. of California*, 591 U.S. 1, 19 (2020) (citing *Reno*, 525 U.S. at 482); *see also Botezatu v. I.N.S.*, 195 F.3d 311, 313 (7th Cir. 1999). That a claim "arises from," or, in other words, is logically connected to, deportation proceedings does not shield it from review. *See Reno*, 525 U.S. at 482.

### B.  Section 1252(b)(9)

Next, the government contends that § 1252(b)(9) shields this case from judicial review. This provision is commonly known as the "zipper clause." *Reno*, 525 U.S. at 483 (cleaned up). The zipper clause reads: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." § 1252(b)(9). The zipper clause also explicitly states that this rule applies to petitions, like this one, brought under § 2241. *Id.*

On its face the zipper clause is quite broad, so it is worth clarifying exactly what questions this court must address. In this case, the court is called upon to answer whether an alien detained by ICE, who has not had a bond hearing, may bring a habeas petition to argue that a warrant defect entitles him to release, that the INA itself entitles him to a bond hearing or, if the INA does not, that the INA's mandatory detention provisions offend the Due Process Clause.

Once again, the court does not write on a clean slate. In *Jennings v. Rodriguez*, the respondents "argued that the relevant statutory provisions" of the INA did "not authorize prolonged detention in the absence of individualized bond hearing[s] at which the Government proves by clear and convincing evidence that the class member's detention remains justified." 583 U.S. 281, 291 (2018) (cleaned up). The respondents further argued that "[a]bsent such a bond-hearing requirement," the INA "would violate the Due Process Clause of the Fifth Amendment." *Id.* The Supreme Court recognized that the zipper clause might bar review, yet it addressed the zipper clause and concluded it did not bar these claims. *See id.* at 292–95 (Alito, J., writing for a plurality); *see also id.* at 355 (Breyer, J., dissenting) ("Jurisdiction" "is unaffected by 8 U.S.C. § 1252(b)(9)"); *see also id.* at 314 (Thomas, J., concurring) ("a majority of the Court believes we have jurisdiction").

But in *Jennings*, the jurisdictional analysis was the holding of a four-justice plurality. And while three justices dissented, they signaled agreement with the plurality's jurisdictional holding. All in all, seven justices, a majority of the members of the Court, concluded that at the very least the zipper clause did not bar review of the issues the respondents in that case raised. What exactly this means for lower courts moving forward is a bit murky.

The court is governed by the rule established in *Marks v. United States*, 430 U.S. 188 (1977). "In general, the U.S. Supreme Court creates precedent only when most Justices endorse a single rule of decision, typically by publishing a majority opinion." Richard M. Re, *Beyond the* Marks *Rule*, 132 Harv. L. Rev. 1942, 1943 (2019). But, as explained in *Marks*, when "a fragmented Court decides a case and no single rationale explaining the result" commands five votes, "the holding of the Court may be viewed as that *position taken* by those Members who concurred in the judgments *on the narrowest grounds*." *Id.* (quoting *Marks*, 430 U.S. at 193) (emphasis added) (further quotation omitted).

In *Jennings*, "a majority of the Court" concluded it "ha[d] jurisdiction." 583 U.S. at 314 (Thomas, J., concurring). Thus, the rule from *Jennings* about the meaning of the zipper clause is whatever the "narrowest grounds" for that holding was.[3] *Marks*, 430 U.S. at 193. The three dissenting justices held that § 1252(b)(9) "applies only 'with respect to review of an order of removal under § 1252(a)(1).'" *Jennings*, 583 U.S. at 355 (Breyer, J., dissenting) (quoting § 1252(b)) (cleaned up)). The four justices in the plurality took a narrower view. They did not purport to "provide a comprehensive interpretation" of the zipper clause. *Id.* at 294 (plurality opinion). Rather, they held that, at the very least, because the respondents were not "asking for review of an order of removal," "challenging the decision to detain" them "in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined," the jurisdiction strip did not apply. *Id.* (plurality opinion). Because the plurality view is a strict subset of the dissent's view, it is the narrower of the two and therefore controls here. *Marks*, 430 U.S. at 193.

In this case, there are three distinct merits questions: (1) whether being arrested without a warrant entitles petitioner to release; (2) whether petitioner is being improperly held without bond under § 1225(b)(2); and (3) whether mandatory detention under § 1225(b)(2) violates the Fifth Amendment's Due Process Clause. The first question is not "asking for review of an order of removal," "challenging the decision to detain" him "in the first place or to seek removal," or "challenging any part of the process by which [his] removability will be determined." *Jennings*, 583 U.S. at 294 (plurality opinion). Therefore, under *Jennings*, this court has jurisdiction to review this claim. The same is true of the final two questions, which are identical to the claims brought in *Jennings* itself. *See id.* at 291. Of course, if jurisdiction was present for those claims in *Jennings*, it is present here too.

---

[3] It bears emphasizing that this jurisdictional holding about the zipper clause controls. A court is obligated to consider jurisdictional questions before it progresses to merits questions. *See Sinochem*, 549 U.S. at 430–31 (citation omitted). Therefore, a jurisdictional holding was necessary to the Court's outcome, making it binding. *See Ramos v. Louisiana*, 590 U.S. 83, 104–05 (2020) (opinion of Gorsuch, J.).

### C. Section 1252(a)(2)(B)(ii)

Finally, the government argues that § 1252(a)(2)(B)(ii) shields this case from judicial review. That section reads: "Notwithstanding" "section 2241," "no court shall have jurisdiction to review" . . . "(ii) any [] decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."

The government acknowledges that the applicability of this jurisdictional bar turns on the merits of this case. Namely, it turns on whether petitioner is detained under § 1225 or § 1226 of the INA. If petitioner is right that only § 1226(a) applies, whether to grant bond is a discretionary decision. But if the United States is right that § 1225 also applies, detention is mandatory. The government contends that, assuming petitioner is right, under "§ 1226(a)" the petitioner's "detention is specified as discretionary" and "therefore insulated from judicial review." [7] at 11.

On its face the United States's claim under this provision is limited. It only applies *if* § 1226 applies—the topic addressed in a following section. *See* § III, *infra*. That naturally means that § 1252(a)(2)(B)(ii) does not preclude review of the entirety of this petition. In other words, it does not preclude review of whether § 1225 or § 1226 applies, whether mandatory detention under § 1225 offends the Due Process Clause, or whether petitioner is entitled to release due to a defect in his arrest.[4]

\*

Assured of jurisdiction, the court proceeds to the merits.

### II. Petitioner's Warrantless Arrest Is Not Grounds For Release On Habeas

Petitioner asserts that "ICE agents detained" him "without a warrant." [1] at 15. The government does not dispute that claim. *See generally* [7]. After his arrest, petitioner "was issued and served a Notice to Appear Form I-862." *Id.* at 5. Furthermore, the parties agree that "[r]emoval proceedings in this case" have been "initiated" and that they are actively proceeding. [10].

Petitioner argues that because his "detention was made by government officials not authorized by law to make this detention, Respondents' detention of Petitioner is not in accordance with law and in excess of statutory authority." [1] at

---

[4] Because the court concludes § 1225 applies, the court declines to address whether the Government's interpretation of § 1252(a)(2)(B)(ii) is correct.

18–19. From that he concludes that he is entitled to immediate release on habeas. *Id*. Under Seventh Circuit precedent, however, that conclusion does not follow from those premises, even assuming the premises are true.

As it concerns this case, the court assumes a warrant was required and notes that the government does not contend that it had a warrant or that an exception to any warrant requirement applies. *See generally* [7]; *see Arias v. Rogers*, 676 F.2d 1139, 1142 (7th Cir. 1982). But even so assuming, under *Arias*, petitioner is not entitled to release on habeas. The Seventh Circuit explained in *Arias* that if an alien is "arrested illegally" "and carted off to jail and the" immigration officials "ha[ve] made no move to begin deportation proceedings, the [alien]" is "entitled to obtain their freedom through a habeas corpus proceeding." 676 F.2d at 1142. However, "once deportation proceedings have begun[,] the legality of the alien's detention" based on the absence of a warrant "can no longer be tested by way of a habeas corpus proceeding." *Id*. at 1143–44. Rather, the alien must obtain relief through "administrative remedies" in removal proceedings. *Id*. at 1143. This is because once a "petitioner[] [is] able to pursue" those administrative remedies, "their detention [is] no longer so lawless as to allow a judge to free them under the habeas corpus statute." *Id*.

In this case petitioner's deportation proceedings have begun. Thus, *Arias* requires that any issues concerning his arrest are not redressable in this habeas petition.[5]

### III. Petitioner Is Subject To Mandatory Detention Under the INA

The INA has several provisions that authorize the detention of aliens pending removal. The Government argues that petitioner is subject to detention under § 1225(b)(2), which states that, in certain circumstances, "an alien who is an applicant for admission" "shall be detained" pending removal proceedings. The government contends that petitioner is an "applicant for admission" and otherwise falls within § 1225(b)(2)'s breadth, making him subject to mandatory detention. Petitioner, on the other hand, argues that he does not fall under § 1225(b)(2)'s breadth. [8] at 4–5. Therefore, he argues, he is only subject to § 1226(a). *See id*. And under that provision, detention during bond proceedings is merely permissible—not mandatory. *See* § 1226(a). Petitioner thus contends that he is entitled to a bond hearing, which is required by federal regulation. *Jennings*, 583 U.S. at 306 (citations omitted). And he concludes that because he has not received a bond hearing, this

---

[5] As *Arias* explains, the mere fact that deportation proceedings have nominally begun does not end the habeas court's inquiry. If deportation proceedings "are being strung out" "without good cause while the alien remains in custody," habeas relief based on a warrant violation may still be available. *Id*. at 1144. Petitioner, however, has not alleged—nor do the facts support—that his deportation proceedings are being delayed unreasonably. [10]. This exception, therefore, is not applicable.

court should order his release from custody as being in violation of federal law. *See* [1] at 17–19; § 2241. Based on the text of § 1225, in context with § 1226, it is this court's determination that petitioner is an "applicant for admission" subject to § 1225(b)(2).[6]

Section 1225(a) defines an "applicant for admission" as any "alien *present* in the United States who has not been admitted *or who arrives* in the United States[,] []whether or not at a designated port of arrival." § 1225(a) (emphasis added). This definition establishes two groups of aliens, separated by the disjunctive "or," who are deemed to be "applicants for admission." *See Loughrin v. U.S.*, 573 U.S. 351, 357 (2014) (noting that the "ordinary use [of 'or'] is almost always disjunctive" and means "the words it connects are to be given separate meanings."). Petitioner is thus an "applicant for admission" if he fits into either group.

Petitioner fits in the first group. He is "present in the United States" and has not been lawfully "admitted." He does not contest these facts. That makes him an "applicant for admission."[7] Consequently, and because he otherwise falls under § 1225(b)(2)'s breadth, that section applies.

---

[6] The court is cognizant that the Seventh Circuit has issued a ruling stating, in part, that § 1225(b)(2) does not apply to all aliens unlawfully present in the United States. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, 2025 WL 3552514, at *8–*10 (7th Cir. Dec. 11, 2025). But *Castañon-Nava* was decided in the context of issuing a stay pending appeal. *Id.* at *4. In that context, an appellate court must assess "whether the stay applicant has made a strong showing that *he is likely to succeed* on the merits." *Id.* (emphasis added) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). But "[i]t must be remembered that" interim relief, like stays, is "by [its] very nature interlocutory, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive" and is "characterized by its for-the-time-beingness." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1435 (7th Cir. 1986) (quotation omitted) (cleaned up). As such, stays are not "decision[s] on the merits"; rather, their purpose is merely to "freeze" a situation "for such time as it may take to determine" the merits. *Ayers v. City of Chi.*, 125 F.3d 1010, 1013 (7th Cir. 1997). And "[g]iven this limited purpose, and given the haste that is often necessary" in issuing a stay, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), the determinations made in stay orders are not binding beyond the resolution of that stay. *See, e.g.*, *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025); *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012). As *Castañon-Nava* itself noted, its "conclusions" "[were] preliminary and based on the limited record available," subject to change after being "present[ed] [with] more fulsome arguments and a more comprehensive record." 2025 WL 3552514, at *12.

[7] Inasmuch as petitioner makes the contention that only those who are actively filing for admission are considered "applicants for admission" for purposes of § 1225(a), the contention fails. *See* [8] at 4–5. While there might be some intuitive force to the notion that "applicant for admission" implies an active choice to file for admission, intuition does not trump text. "Applicant for admission" is a defined term of art. *See* § 1225(a). It includes no requirement that the alien have submitted an application for lawful admission; it also includes no

Petitioner argues that not all "applicants for admission" are "seeking admission" and that consequently § 1225(b)(2) does not apply to all "applicants for admission." *See* [8] at 4 ("[T]he statute draws a distinction between those seeking admission . . . and those already in the country"). More precisely, the argument goes that the court should draw a distinction in § 1225(b)(2)(A) between "an alien who is" merely "an applicant for admission" and an "applicant for admission" who *is also* "an alien seeking admission," finding that the latter is a subset of (or overlaps with) the former. But that is not the most natural reading of the text. Section 1225(b)(2)(A) discusses "the case of an alien who is an applicant for admission." The statute then describes the rule for such applicants by stating that "if . . . an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained." Interpreting "alien seeking admission" so as to not include all aliens deemed "applicants for admission" creates a term of art, "alien seeking admission," that is not otherwise defined that way in § 1225 or in the INA more generally. Indeed, that interpretation construes that phrase in a way that contradicts what it means to be an alien "seeking admission" elsewhere in § 1225 itself. Section 1225(a)(3) covers "applicants for admission" and those "otherwise seeking admission." The use of "otherwise" demonstrates that "applicants" are in the category of aliens "seeking" admission, which is a superset of "applicants" that also includes other groups of aliens like those seeking "transit through the United States." *Id.* Interpreting "aliens seeking admission" to not include all "applicants," then, violates the general principle that "identical words and phrases within the same statute should normally be given the same meaning." *Monsalvo v. Bondi*, 604 U.S. 712, 726 (2025) (quotation omitted). What's more, the argument that "aliens seeking admission" are a subset of "applicants for admission" also contradicts § 1225(a)(5). That provision explicitly refers to an "applicant for admission" as "seeking admission." Most naturally read, then, § 1225 is clear that "applicant[s] for admission" are deemed to be "seeking admission" for purposes of § 1225(b)(2).[8]

Neither the overlap between § 1225(b)(2) and § 1226, nor other aspects of the INA such as titles and recent amendments, nor language in *Jennings v. Rodriguez*, where the Supreme Court described § 1226 as the "default rule," 583 U.S. at 303, cast doubt on this conclusion.

To start, that § 1225 applies to aliens already present in the United States does not render § 1226 superfluous. Constructions of statutes which lead to any "clause,

---

requirement that the alien have signaled intent to submit such an application. Any alien "present in the United States who has not been admitted" is an "applicant for admission" under the plain text of § 1225(a). That he has been living in the country for years does not change that he is within § 1225(a)'s scope.

[8] Even if "aliens seeking admission" did not include all "applicant[s] for admission," petitioner would still naturally be understood to be "seeking admission." As petitioner notes, he "is in the process of applying for Cancellation of Removal"; that is, seeking admission. [10] at 1.

sentence, or word" being rendered "superfluous, void, or insignificant" ought to be avoided if possible. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation omitted). But that canon applies only where the statute's construction renders a clause or provision "*entirely* superfluous *in all but* the most unusual circumstances." *Id.* at 29 (emphasis added); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 177 (2012) (constructions that "render[] some words altogether redundant" ought to be avoided). "Some overlap" between statutes, by contrast, "does not render either superfluous." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 311 (7th Cir. 2021); *see also Skilling v. United States*, 561 U.S. 358, 413 n.45 (2010).

Sections 1225(b)(2) and 1226 have different, but overlapping, scopes. Section 1226 is a general provision that covers "alien[s]." § 1226(a). This includes both aliens who have been lawfully admitted (such as those with visas or lawful permanent residence) and aliens in the country illegally. Section 1225(b)(2), by contrast, is a specific provision that covers the subset of aliens deemed "applicant[s] for admission." § 1225(a). As described above, these are aliens "present in the United States who ha[ve] not been admitted or who arrive in the United States." *Id.* Because all "applicant[s] for admission," *see* § 1225, are "alien[s]," *see* § 1226, the statutes necessarily overlap.

But while §§ 1225 and 1226 overlap, even "substantial" overlap does not create superfluity. *Loughrin v. U.S.*, 573 U.S. 351, 358 n.4 (2014). Contextually, § 1225(b)(2) is specific while § 1226 is general. And in such situations, the specific provision does not invalidate or render superfluous the general provision. *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *see also* Scalia & Garner, *supra*, at 183–88 (General/Specific Canon).

The upshot of this statutory scheme is that those aliens subject solely to § 1226 may be released pending their removal proceedings, but "aliens falling within the scope of § 1225(b)(2) shall be detained for a [removal] proceeding." *Jennings*, 583 U.S. at 297 (quotation omitted); *see also id.* at 300 (§ 1225(b)(2) "do[es] not use the word 'may.' Instead, [it] unequivocally mandate[s] that aliens falling within [its] scope 'shall' be detained."). That scheme operates in a consistent manner and does not suffer from superfluity.

An argument from statutory title—suggesting that § 1225 is limited to aliens applying for admission when they first arrive at the United States' border—does not undermine the court's conclusion. *See* § 1225 (title reading in part "expedited removal of inadmissible arriving aliens"). Even if this court were to give weight to § 1225's title,[9] the quoted language from the title is a partial excerpt that does not purport to

---

[9] Whether and how much to do so is a topic of disagreement. *Compare Yates v. United States*, 574 U.S. 528, 539–40 (2015), *with id.* at 553–54 (Kagan, J., dissenting), *with Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998).

summarize the complete statutory text. And, in any event, the presence of the title could not be used to mangle § 1225's text. If § 1225 is read to apply only to the aliens mentioned in the title—those physically arriving at the border—that would make nugatory a portion of § 1225(a). Namely, by its terms, § 1225(a)(1) says that an "alien *present in* the United States . . . *or who arrives* in the United States" is an applicant for admission. Any construction of the statute which limits its breadth to aliens at the border reads out the first half of the disjunction, and that move is impermissible. *Marinello v. United States*, 584 U.S. 1, 9 (2018) (Courts may not "interpret[] a statutory provision" in such a way "that would create . . . redundancy" and "render superfluous other provisions in the same enactment." (quotation omitted)).

Recent amendments to the INA—namely, the Laken Riley Act. Pub. L. No. 119–1, 139 Stat. 3 (2025)—do not change the court's analysis. Generally speaking, even under § 1226 certain aliens who have been convicted of or charged with certain crimes are required to be detained pending their removal proceedings. "The Laken Riley Act added § 1226(c)(1)(E)," which expands which aliens detained under § 1226 are subject to mandatory detention. *See Martinez-Elvir v. Olson*, No. 3:25-cv-589, 2025 WL 3006772, at *8 (W.D. Ky. Oct. 27, 2025). An argument goes that if § 1225(b)(2) *and* § 1226(c) both apply to aliens present in the United States unlawfully and require mandatory detention, the Laken Riley Act—recent legislation—is redundant. But this argument fails. Under this court's interpretation of §§ 1225 and 1226, the Laken Riley Act is still a material change in the immigration laws. Now, additional aliens who are not "applicant[s] for admission," and thereby do not fall under § 1225(b)'s mandatory detention provisions, are nevertheless subject to § 1226(c)'s mandatory detention provisions. And while certain aliens do fall under both statutes, that overlap does not constitute superfluity for the reasons explained above.

Stray words in *Jennings* also cannot be used to evade statutory clarity. It is true that *Jennings* utilizes language that, when stripped from its context, could be read to imply that only § 1226, and not § 1225, applies to many unadmitted aliens present in the United States. For example, the *Jennings* court describes § 1226(a) as the "default rule" for those "already present in the United States." 583 U.S. at 303. But *Jennings* was not confronted with the question presented in this case. And in any event, it is consistent with its being a "default rule" that § 1226 can be overridden by § 1225 in certain circumstances. *See* Scalia & Garner, *supra*, at 183–88 (General/Specific Canon). Default rules are just that—defaults. *Jennings* also makes clear that § 1226 "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings." 583 U.S. at 289. But all this means is that § 1225 and § 1226 overlap. And as discussed above, overlap is not problematic.

By its plain meaning, § 1225(b)(2) applies to petitioner. That § 1226(a) also applies does not change the applicability of § 1225(b)(2), nor does it pose a superfluity problem. As a matter of statute, petitioner is properly being detained without bond.

## IV. Petitioner's Mandatory Detention Is Consistent With The Due Process Clause

The INA requires that aliens covered by § 1225(b)(2), like petitioner, remain in detention pending their removal proceedings. In other words, release on bond is categorically barred by statute. The decision to detain is taken away from immigration judges and does not account for the individual circumstances of the alien. Petitioner contends that this scheme offends the Fifth Amendment's Due Process Clause.

This section proceeds in two parts. First, it explains that at least some (though not all) aliens illegally present in the United States receive protection from the Due Process Clause. Second, it explains that mandatory detention under § 1225(b)(2)—at least within limits, none of which are violated on the facts of this case—does not offend the Due Process Clause.

### A. The Due Process Clause Applies

The Fifth Amendment requires, "nor shall any person . . . be deprived of life, liberty, or property, without due process of law." "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993) (citing *The Japanese Immigrant Case*, 189 U.S. 86, 100–01 (1903)). But if the scope of the due process protections afforded to an alien in petitioner's circumstances—that is, someone who does not allege that he is present in the country legally—was as simple as that quotation, this section would need be but a footnote. It is not that simple. The court must first address the question of whether that statement from *Reno* only extends to aliens here legally.

Supreme Court cases such as *Reno* indicate that citizenship is not a prerequisite to the enjoyment of at least some constitutional rights. *See, e.g.*, *Reno*, 507 U.S. at 306; *Demore v. Kim*, 538 U.S. 510, 523 (2003). Many of the Supreme Court's cases dealing with the due process rights of aliens, however, either involve aliens who were admitted into the country legally, or the Supreme Court did not elaborate upon the status of the alien involved. *See, e.g.*, *Demore*, 538 U.S. at 513; *Zadvydas v. Davis*, 533 U.S. 678, 684 (2001); *J. G. G.*, 604 U.S. at 673. Furthermore, the Supreme Court has also made quite clear that certain aliens are entitled "only [to] those rights" "that Congress has provided by statute" and do not receive additional protections from the Due Process Clause. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020).

The United States contends that any alien who entered the country illegally—no matter the length of time they have been in the United States, nor the family or community ties they have, nor any other circumstances related to their presence—belongs in that latter category. That is, the government's position is that "[w]ithout a lawful entry or admission," petitioner "has no more due process rights than what

processes Congress chooses to provide him." [7] at 20. If that is right, petitioner's mandatory detention is plainly permissible, and the Due Process Clause cannot have more to say.

For this principle, the United States cites *Thuraissigiam*, 591 U.S. at 138–40. But the Government's argument does not account for repeated statements in other Supreme Court cases regarding due process in the immigration context, which indicate that even some aliens here illegally receive protection from the Due Process Clause. When the entire body of the Supreme Court's cases on this issue is considered, the best account is that "aliens living *in* the United States without authorization are entitled to constitutional due process" whereas "aliens who have not yet entered the country" in a meaningful way "are entitled only to such process as the political branches afford them." *Martinez v. Larose*, 980 F.3d 551, 552 (6th Cir. 2020) (mem.) (Thapar, J., concurring in the denial of rehearing en banc).

In discussing the Supreme Court's caselaw, it is most helpful to start at the border. An alien stopped at the border is not entitled to judicial process before he may be turned away from admission. As the Supreme Court has explained, "[a]liens seeking entry from contiguous lands obviously can be turned back at the border without more." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953). That is because "[t]he power to admit or exclude aliens is a sovereign prerogative"; "the Constitution gives the political department of the government plenary authority to decide which aliens to admit." *Thuraissigiam*, 591 U.S. at 139 (cleaned up and quotations omitted). If an alien never crosses the border, he never secures constitutional rights regarding exclusion from the United States.

But the border itself is not a magical line that, once crossed, means an alien obtains the full suite of rights that lawful residents possess. The Supreme Court has identified at least two categories of aliens who have stepped foot in the United States beyond the border, but who are nevertheless treated like those who never have and receive "only those rights" "that Congress has provided by statute," as it concerns their removal process. *Id.* at 140. Those two categories are aliens who are "detained shortly after" an "unlawful entry," and those who "arrive at a port of entry" but who are "paroled elsewhere in the country," even "for years[,] pending removal." *Id.* at 139 (quoting *Mezei*, 345 U.S. at 215). In both sets of cases, the Supreme Court applies what is called an "entry fiction." Namely, despite the alien being present in the United States, he is "treated for due process purposes as if stopped at the border." *Id.* (citing *Mezei*, 345 U.S. at 215) (cleaned up).

Cases shed light on the situations where the entry fiction applies. Take an example from the first category. In *Thuraisiggiam*, an alien was apprehended after "making it 25 yards into U.S. territory before he was caught." *Id.* That, "he claim[ed]," entitled him to "the right to be treated more favorably" than those who never make it even an inch. *Id.* The court "reject[ed]" that claim, making clear that merely stepping foot "on U.S. soil" does not mean an "alien is . . . considered to have entered

the country." *Id.* at 140. An alien apprehended immediately after crossing the border, even after making it beyond border patrol, is nevertheless treated for due process purposes as if he never set foot on U.S. soil.

Examples from the second category involve aliens who arrive at ports of entry and then are granted supervised access within the United States, sometimes referred to as "parole," while their admission (or exclusion) is processed. A paradigmatic example is *Kaplan v. Tod*, 267 U.S. 228 (1925). That case dealt with an immigrant "born in Russia" who, at "about thirteen years old" "was brought to" the United States "where her father already was." *Id.* at 229. She "was ordered to be excluded," "but before the order could be carried into effect[,] the European war" began. *Id.* "Deportation necessarily was suspended," so "she was kept at Ellis Island" for about a year. *Id.* She was then "handed over to the Hebrew Sheltering and Immigrant Aid Society upon its undertaking to accept custody" "until she could be deported safely." *Id.* "The Society allowed her to live with her father" until 1923, when her warrant of deportation was issued. *Id.*

The Supreme Court explained that "while she was at Ellis Island," "she was" nevertheless "to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared." *Id.* at 230. Moreover, when "her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was *still in theory of law at the boundary line* and had gained no foothold in the United States." *Id.* (emphasis added).

Another example is *Shaughnessy v. United States ex rel. Mezei*. In *Mezei*, an alien "seemingly" "born in Gibraltar" and "of Hungarian or Rumanian parents" had "lived in the United States from 1923 to 1948"; he "sailed for Europe" and was "[d]enied entry there." 345 U.S. at 208. Having been rejected, he eventually "proceeded to France and boarded the Ile de France in Le Havre bound for New York." *Id.* He "was received at Ellis Island" temporarily, but "the Attorney General" ordered his "temporary exclusion to be made permanent without a hearing." *Id.* Problematically, however, several nations "turned him down" for admission—therefore, he remained "on Ellis Island." *Id.* at 209. He then argued he could not be kept on Ellis Island without a hearing. *See id.* But the Supreme Court, like in *Kaplan*, found that "[n]either respondent's harborage on Ellis Island nor his prior residence" gave him any other rights than someone who never stepped foot on U.S. soil at all. *Id.* at 213. As the Court explained, the entry fiction applied: "temporary arrangements" to step foot in the United States do not "affect[] an alien's status; he is treated as if stopped at the border." *Id.* at 215.

The United States would apply that "entry fiction" to the petitioner here. [7] at 20 (citing *Kaplan*). And not without intuitive reason.[10] But this case is materially distinct from the cases where the Supreme Court applied the entry fiction. Petitioner was not apprehended within a football field of the border. He was not apprehended at or near the border and let into Illinois on strict supervision. Rather, he "entered the United States nearly twenty years ago" and "has no prior immigration record." [1] at 15. For aliens in those circumstances, the Supreme Court has stated repeatedly that "aliens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212 (emphasis added) (quotation omitted); *see also Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Plyler v. Doe*, 457 U.S. 202, 206, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth" amendment); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958).

The precise extent of these statements is not clear. As best as the court can tell, none of these cases appears to have squarely addressed facts like those here, where petitioner entered illegally many years ago and was apprehended far from the border. The cases do not always say whether the petitioners in any particular case held any form of lawful status. And "the Supreme Court has suggested in several other opinions that *recent* clandestine entrants . . . do not qualify for constitutional protections based merely on their physical presence alone." *Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 448 (3d Cir. 2016) (emphasis added). Nonetheless, to conclude that *Thurassigiam* extended the entry fiction to the circumstances here, the court would have to conclude that *Thurassigiam* displaced the Supreme Court's repeated prior statements. The more reasonable reading of the entire body of Supreme Court cases is that, while there may be difficult edge cases about when the entry fiction applies, and while this court does not purport to describe exactly when it applies, the entry fiction does not apply to petitioner. Thus, the court tests the process petitioner has received under § 1225(b)(2) against the Due Process Clause.

### B. Section 1225(b)(2) Does Not Violate The Due Process Clause

The prior section established that compliance with § 1225(b)(2) does not, by itself, resolve petitioner's separate due process claim. But that does not mean he is

---

[10] The alternative to applying the entry fiction is that those who arrive at ports of entry and ask to enter receive less protection than those who evade those ports and enter illegally. But whether the rule is a sensible one is not a question this court has the latitude to revisit, given Supreme Court precedent.

entitled to relief—rather, it means this court must ask what, *if any*, process he is due in addition to what he is already receiving. The answer is none, because petitioner's mandatory detention under § 1225(b)(2) complies with the Due Process Clause.

Generally speaking, the question of "how much procedure is owed" is governed by the Supreme Court's test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (citing *Mathews* in remanding for parties to address whether procedures for returning permanent resident alien afforded due process). And the Seventh Circuit has applied the *Mathews* test when evaluating the constitutionality of mandatory detention for aliens. *See Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999). The court too, then, proceeds under the *Mathews* framework.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment[s]." *Mathews*, 424 U.S. at 332. Under precedent, mandatory detention under § 1225(b)(2) deprives aliens of a cognizable liberty interest. *See, e.g.*, *Parra*, 172 F.3d at 958. When determining the amount of procedure owed—that is, whether § 1225(b)(2) provides enough procedure—*Mathews* instructs that a court consider three factors: "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures." *Landon*, 459 U.S. at 34 (citing *Mathews*, 424 U.S. at 334–35)). Both the first and the third factors, the individual's and government's respective interests, have been squarely addressed by precedent, so the court discusses them first.

Starting with the first factor, petitioner's interest. Petitioner would ask this court to recognize his liberty interest in being free pending his removal proceedings. But as the Seventh Circuit explained in *Parra*, for someone like petitioner who does not contend that he is ineligible for removal, "[t]he private interest" in freedom from mandatory detention "is not liberty in the abstract, but liberty *in the United States* by someone" who is not "entitled to remain in this country but eligible to live at liberty in his native land." *Parra*, 172 F.3d at 958. That interest is, the Seventh Circuit has held, quite low compared to the "pretrial detention" context in "criminal prosecutions." *Id.*; *see also Gonzalez v. O'Connell*, 355 F.3d 1010, 1019–20 (7th Cir. 2004) (recognizing the continuing validity of *Parra* after intervening Supreme Court decisions in *Demore* and *Zadvydas*). Under *Parra*, because petitioner does not attempt to argue that he is "entitled to remain in" the United States, his private interest in release pending his removal proceedings is relatively minimal. 172 F.3d at 958.

Jumping next to the third factor, the government's interest. The Supreme Court has opined extensively on the weighty interest the United States has in

controlling who enters and exits. The Court has also made clear that attending that interest is a broad power to enforce it.

"In the exercise of its broad power over naturalization and immigration, Congress regularly," and lawfully, "makes rules that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 521–22 (citing *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). This broad power stems from the commitments of certain powers to the political branches of government: "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Id.* at 522 (quotation omitted). As noted above, the "power to admit or exclude aliens is a sovereign prerogative," "and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139 (quotation omitted). Thus, in applying *Mathews* the court must recognize the extraordinarily high interest the "political department of the government" has in crafting procedures related to immigration policy. *Id.* (quotation omitted).

Turning last to the second factor, the procedures used as compared to alternative options. Petitioner suggests that this court must borrow from the pretrial detention context, *see* [1] at 18, and craft a system where immigration judges are obligated to consider flight risk and danger to the community before imposing detention during the pendency of removal proceedings. *See* 18 U.S.C. § 3142; *United States v. Salerno*, 481 U.S. 739, 747 (1987). Because reading in such a requirement would contradict precedent and would constitute policymaking beyond the court's role, the court declines to do so.

In evaluating 8 U.S.C. § 1226(c), which imposes mandatory detention for aliens who have committed certain crimes, the Supreme Court made clear that mandatory detention is permissible. *Demore*, 538 U.S. at 528, 531. It also made clear that a finding that an alien is a "flight risk[]" or is "dangerous[]" is not a prerequisite finding to the constitutional validity of mandatory detention during removal proceedings. *Id.* at 524–25. Nor did it matter in *Demore* that the aliens were accused of crimes; rather, the court found that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id.* at 526; *see also Carlson v. Landon*, 342 U.S. 524, 533–34 (1952) (finding that bail is not guaranteed for even non-criminal aliens pending removal proceedings). Simply put, "[d]etention during removal proceedings is a constitutionally permissible part of that process." *Demore*, 538 U.S. at 531 (citation omitted).

The Seventh Circuit has recognized that some additional process regarding detention *might* be due when a petitioner raises "a good-faith challenge to his deportability." *Gonzalez*, 355 F.3d at 1020. However, if an alien does not contest that he is deportable, or if he "raise[s] a facially meritless claim[]" that he is not deportable,

mandatory detention comports with the Due Process Clause. *Id.* at 1019. Here, petitioner makes no claim that he is entitled to remain in the United States.

And while this court must consider the value of alternative procedures, it also must remain cognizant that the legislative branch's decision to create multiple detention schemes is largely a political decision. As the Supreme Court has instructed in a case applying *Mathews*, "[t]he role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices." *Landon*, 459 U.S. at 34–35. "Thus, it would be improper simply to impose deportation procedures here because the reviewing court may find them preferable." *Id.* at 35.[11]

Taking all this into account, the court concludes the Due Process Clause is not offended by Congress's choice to impose mandatory detention under § 1225(b)(2). While there is value to additional safeguards such as individualized bond hearings, the comparative weight between Congress' interest and petitioner's is striking. This decision also aligns with decades of Supreme Court and Seventh Circuit precedent permitting mandatory detention schemes. And it respects the especially limited role of the judiciary in evaluating legislation in this context.

On a final note, other precedents like *Zadvydas v. Davis* do not cast doubt on the validity of mandatory detention in these circumstances. In *Zadvydas*, albeit while applying the canon of constitutional avoidance, the Supreme Court expressed concern that the "indefinite detention of an alien would raise a serious constitutional problem" under the "Fifth Amendment's Due Process Clause." 533 U.S. at 690. But *Demore* carefully explained that those concerns were only present when the petitioners were being indefinitely detained *after* their removal had been ordered. The Court noted that in *Zadvydas* the "detention's goal" was "no longer practically attainable" and that the detention at issue bore no "reasonable relation to the purpose for which the individual was committed." *Demore*, 538 U.S. at 527. By contrast, the Court held, in cases where "the statutory provision at issue governs detention of deportable criminal aliens *pending their removal proceedings*," that "detention necessarily serves the purpose of preventing" them "from fleeing prior to or during their removal proceedings." *Id.* at 527–28 (distinguishing *Zadvydas*) (emphasis added). *Demore* also emphasized that in *Zadvydas*, "the period of detention at issue" "was indefinite and

---

[11] Courts might be able to theorize other ways to create a more tailored bond system—for example, a system where bond must at least be optional but at the discretion of immigration judges. Some statutes permit exactly that. *See* § 1226(a)(1) (The Attorney General "may continue to detain the arrested alien."). While a more tailored system always has value, it does not outbalance the extraordinarily weighty interest the United States has in controlling who enters and exits. There are multiple competing values that must be balanced against each other, and in this context that balancing is largely committed to the legislative branch.

potentially permanent." *Id.* at 528 (quotation omitted). The Court was clear that shorter-term detention is "materially different." *Id.*

In this case, petitioner's mandatory detention is occurring during the pendency of his removal proceedings—not after. *See Jennings*, 583 U.S. at 299. Furthermore, the statute permits detention "for a specified period of time." *Id.* And petitioner does not claim he has already been detained for an amount of time that is unreasonable in light of the need to conduct removal proceedings. Rather, he has been detained for approximately two months. [1] at 5. That is far less than the six months *Demore* found to be a permissible length of time. 538 U.S. at 530–31. As the Seventh Circuit has explained, the concern that motivated *Zadvydas* is not present when review is actually "pending"—in such cases, there is no risk that the alien will simply "languish in detention" with no end in sight. *Hussain v. Mukasey*, 510 F.3d 739, 742 (7th Cir. 2007).[12] *Zadvydas*, then, casts no doubt on this court's conclusion that mandatory detention is constitutionally compliant.

\* \* \*

The petition for a writ of habeas corpus [1] is denied. While this court has jurisdiction over petitioner's claims, petitioner has not demonstrated that his mandatory detention offends federal law.

Dated: December 17, 2025                                                            /s/ Martha M. Pacold

---

[12] The court, today, does not opine on the full contours of the Due Process Clause and its application to detention proceedings. Rather, the only holding is that a reasonable amount of mandatory detention related to an ongoing removal proceeding does not offend the Constitution. Questions about how long is too long are not present in this case.